United States District Court
For the Northern District of California

1
2
3
4
5
6
7                          NOT FOR CITATION

8          IN THE UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                      SAN JOSE DIVISION

11
   PIOTR J. GARDIAS,                    No. C04-04086 HRL
12
                Plaintiff,              Consolidated With:  C04-04768 HRL
13                                                          C05-01242 HRL
       v.                                                   C05-01833 HRL
14                                                          C06-04695 HRL

15  SAN JOSE STATE UNIVERSITY,          **ORDER GRANTING DEFENDANT'S
                                        MOTION FOR SUMMARY JUDGMENT**
16                Defendant.
                                        **[Re: Docket No. 323]**
17  _____/

18

19       This is a consolidated action, filed pursuant to Title VII of the Civil Rights Act of 1964,

20  42 U.S.C. § 2000e, et seq. ("Title VII"), for alleged employment discrimination.  Defendant

21  California State University[1] moves for summary judgment as to all claims.  Plaintiff Piotr J.

22  Gardias, proceeding pro se, opposes the motion.  Upon consideration of the moving and

23  responding papers, as well as the arguments presented at the motion hearing, this court

24  GRANTS the motion.[2]

25

26

27

28

_____

[1]      Defendant says that it was erroneously sued as "San Jose State University."

[2]      Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, all parties have
expressly consented that all proceedings in this matter may be heard and finally adjudicated
by the undersigned.

**I. BACKGROUND**[3]

Since 1989, Gardias has been employed by the California State University system at the San Jose State University ("SJSU" or "University") campus. He claims that defendant failed to promote him to certain positions because of his age and national origin, and in retaliation for his discrimination complaints. He also says that he has been harassed and subject to a hostile work environment. Except as otherwise indicated, there is no material dispute as to the following facts:

Gardias was born in Poland in 1933 and was raised there. He graduated in 1954 from Gdansk Technical University with a degree in mechanical engineering (heat turbines). He later earned a master's degree in mechanical engineering (mechanics) from the University of Warsaw in 1959 and another in mechanical engineering (nuclear power) from the Technical University of Warsaw in 1962. After immigrating to the United States, plaintiff also obtained a master's degree in engineering from SJSU in 1992. Gardias' resume indicates that, before coming to the United States, he supervised projects pertaining to the construction of pipelines, power plants and like facilities in other countries, including Turkey and Indonesia, at various periods between 1973 and 1987. (Plaintiff's Index I). Although he reportedly had a license at some point when he worked in Poland, Gardias is not a licensed California Professional Engineer.

---

[3] The court pauses to identify certain matters that are <u>not</u> at issue in this litigation. First, there is no claim as to Chris Nordby and a position at the University's Cogeneration Turbine Plant. This court previously determined that any claim as to that position has not been properly raised in this case. (<u>See</u> Docket No. 287, September 10, 2007 Order). Second, although Gardias continues to assert certain health-related issues, he previously withdrew, in open court, all claims based upon his health. Since then, he has flip-flopped on that position depending on what stance he believed would be more advantageous to him at a given moment. The fact remains, however, that he vigorously opposed defendant's efforts to obtain discovery of his medical records by disclaiming any disability and any intent to inject issues as to his health in this litigation. Indeed, defendant consequently was barred from taking that discovery because of the position taken by plaintiff. When asked by the court for the basis of his claims against defendant, plaintiff confirmed that he claims only that he has been unfairly treated on the basis of his age and national origin. (<u>See</u> Docket No. 277, August 22, 2007 Order). In any event, Gardias subsequently filed a separate lawsuit – his sixth, but by no means his last complaint, filed in this court – indicating that he intends to claim discrimination or harassment based upon an alleged disability. That action, Case No. C07-06242, has not been consolidated with the instant suit.

**United States District Court**
For the Northern District of California

1    SJSU hired Gardias in 1989 to work as an Operating Engineer at the Cogeneration and

2    Central Plants.  In about 1993, he was reassigned to work in the Facilities Development and

3    Operations ("FDO") department as a Maintenance Mechanic/Building Service Engineer[4] – the

4    position he has held for most of his employment at the University, and the one he continues to

5    hold today.  This is a skilled trade position involving the operation, maintenance, inspection and

6    repair of the ventilation, heating and water systems on campus.  Gardias believes that his

7    current position is far below his education and experience.  He has therefore sought other

8    employment opportunities at SJSU.  And, thus, events forming the basis for the instant

9    consolidated lawsuit began to unfold.

10   **A.     Building Official Assistant Position[5]**

11   In June 2001, plaintiff was given an opportunity to work in the department of Planning,

12   Design and Construction ("PDC department") as a Building Official Assistant, performing

13   blueprint review and construction inspection.  (See Delgado Decl., Ex. A).  In his view, this was

14   a step up on the University's employment ladder.

15   Nevertheless, according to plaintiff's account of events, his stint at the PDC department

16   was by no means smooth.  He says he was criticized for yelling at an architect – Gardias admits

17   he yelled, but claims that, at the time, he did not realize he was raising his voice.  He says that

18   he requested certain work tools and permission to attend a symposium, but claims that Allan

19   Freeman (not clearly identified by plaintiff, but apparently an administrator within the PDC

20   department) failed to secure the requisite funds.  Another time, Gardias was offended when Art

21   Heinrich (also not clearly identified by plaintiff, but apparently a co-worker within the PDC

22   department) allegedly removed Gardias' notes from a blueprint without telling him first.  In one

23   June 2002 incident, Gardias says he went to speak with Heinrich about work duties and

24   organization in the PDC department.  Heinrich allegedly "yelled at me immediately 'get out of

25

26   [4]     This position previously was titled "Maintenance Mechanic," but was later
     renamed "Building Service Engineer."  For present purposes, and for simplicity, this court
     will refer to the position by its current title.

27

28   [5]     For background purposes, the facts pertaining to this position are set out here.
     As discussed more fully below, however, Gardias' claims as to the Building Official
     Assistant position are time-barred.  (See discussion infra, Section III.C.1.).

my office.'" (Plaintiff's Index VI at 8).  Gardias reportedly was not permitted to post his credentials on the PDC internet homepage.  He opines that Freeman did not like the idea because Freeman "has [a] PhD" and that the request therefore was "not good for him."  (Rivera Decl., Ex. A at AGO-1617-19).  Gardias further asserts that "[t]he hiding of my knowledge from clients creates their mistrust."  (Id.).  There is, however, no evidence indicating that other non-supervisor PDC employees were allowed to post their credentials on the internet homepage.  Gardias also claims to have been rejected for other (unidentified) positions he applied for in the PDC department.

In September 2002, the Building Official Assistant position was terminated, and Gardias was returned to his prior job classification as a Building Service Engineer.  According to defendant, plaintiff's assignment to the Building Official Assistant position was only temporary, and the termination of the position was not a reflection of his performance.  Rather, the position had to be terminated for budgetary reasons.  (See Rivera Decl., Ex. A at AGO 307).  Plaintiff disagrees.  He feels that if there had been legitimate budgetary concerns, the PDC department would not have gone out and purchased an electric cart at around this same time.  He claims that he was never told that the Building Official Assistant position was temporary until September 2002, when he learned that the position was being terminated.  He further contends that his supervisors in the PDC department had earlier told him that they planned to have him stay in the position permanently.  (Plaintiff's Index IV).  He believes that his return to his prior Building Service Engineer position was, in effect, a demotion.  But he does not claim that he received less money or suffered a reduction in any benefits.  Nor is there anything to suggest that his personnel record was smeared in any way.  Rather, Gardias testified in deposition that he did not like being returned to a job with the title "Maintenance Mechanic" (at the time, the position had not yet been renamed "Building Service Engineer").  Nonetheless, he believed that Betty Luna, Director of Facility Operations, was being truthful when she said that the return to his prior position was, in fact, not a demotion.  (Cain-Simon Decl., Ex. E (Gardias Depo. at 204:13-205:17)).

4

**United States District Court**
For the Northern District of California

**B.**      **Construction Coordinator**[6]

In 2002, Gardias applied for the position of Construction Coordinator.  The Construction Coordinator is responsible for the day-to-day management of the University's construction projects.  Essential duties include (a) inspecting and monitoring construction sites (as well as all pre-construction activities); (b) providing technical guidance and support to plant maintenance staff and to the health and safety office; (c) developing project specifications and writing construction specifications; (d) ensuring compliance with building, fire and safety codes; (e) developing budgets; and (f) acting as the University's liaison with architectural and engineering consultants.  (Rivera Decl., Ex. A at AGO 0972-0973).  Additionally, the Construction Coordinator is expected to have thorough knowledge of construction methods, practices and procedures," as well as modern management and administrative techniques relating to fiscal controls, personnel, work planning, scheduling and coordination.  (Id.).  Preferably, the candidate would have a "[m]aster's degree in [a] related field and/or [a] license in architecture and/or [a] certification in building inspection."  (Id.).

After an initial screening, Gardias was interviewed for the position.  According to defendant, all three members of the interview panel noted that he lacked the necessary communication skills.  The position was given instead to James Fernane.  According to Fernane's resume, he had earned a college degree in architecture/city planning and had then worked at various places, including several years at the University of California at Berkeley as an Associate Project Manager on projects involving university housing, dining and office facilities.  (Plaintiff's Index IV).  Fernane reportedly left SJSU shortly thereafter, and plaintiff contends that it was because Fernane did not possess all the skills he claimed to have.  There is, however, no indication in the record that when Fernane was hired, defendant had any reason to believe that he did not have the skills and experience he claimed.  Gardias maintains that he was the more qualified candidate and that he should not have been reassigned from Building Official Assistant to his prior Building Service Engineer position while there was a vacancy for

---

[6]      As discussed more fully below, plaintiff's claims as to this position are also time-barred.  (See discussion, infra, Section III.C.1.).

United States District Court
For the Northern District of California

Construction Coordinator.  He nonetheless testified in deposition that none of the members of the interview committee discriminated against him.  (Cain-Simon Decl., Ex. E (Gardias Depo. 356:9-358:25)).[7]

**C.      Director of Planning, Design & Construction**

Gardias next applied, in July 2003, for the position of Director, Planning, Design & Construction ("PDC Director"), an executive-level position.  The PDC Director administers policies and procedures for planning and developing the University's campus.  According to the job description, the PDC Director, among other things:

- "Provides leadership for all phases of the capital planning and project delivery process, (i.e., scope, feasibility, programming, schematic design, design development, construction documents, construction, move in and close out)";

- "Develops and implements the University's five-year capital outlay program, the physical master plan, and the annual minor capital outlay";

- "Ensures that the budget integrity of the Service Group/Division/University is not compromised"

- "Serves as an active member of various campus facilities-related advisory boards";

- "Ensures that campus physical development, including on- and off-campus properties, satisfy the requirements of the campus Long Range Development Plan and the Environmental Impact Report (EIR)"; and

- "As needed, directs the preliminary environmental assessments for capital projects on campus ensuring compliance with the California Environmental Quality Act (CEQA) and provides technical support and review for off-campus projects."

(Rivera Decl., Ex. A at AGO170-71).  Additionally, the PDC Director must be an excellent communicator who is able to identify and promote public/public and public/private

---

[7]      Gardias later reversed this position and "corrected" his testimony to indicate, generally, that the members of the interview committee did discriminate against him.  (See Plaintiff's "May 16, 2007 Deposition Transcript Correction And Changes, Case No. C04-04086, Docket No. 247 at 34).  Indeed, many of his "corrections" constitute complete reversals of his prior testimony.  "While the language of FRCP 30(e) permits corrections 'in form or substance,' this permission does not properly include changes offered solely to create a material factual dispute in a tactical attempt to evade an unfavorable summary judgment."  Hambleton Brothers Lumber Co. v. Balkin Enterprises, Inc., 397 F.3d 1217, 1225 (9th Cir. 2005).  Such "corrections" by Gardias do not create a genuine issue of material fact.

United States District Court

For the Northern District of California

development opportunities; to manage complex projects through staff and outside consultants; and to work effectively across all levels of the university, demonstrating collaborative decision-making skills.  (Id.).

Gardias was not interviewed for this position.  Defendant points out that, in deposition, plaintiff testified that he did not know what the term "regulatory compliance" meant in the context of developing a large capital project.  (Cain-Simon Decl., Ex. E (Gardias Depo. at 93:25-94:20)).  When asked whether he knew what the acronym "CEQA" stands for, Gardias answered: "That – maybe I know, but just that there are many – many – many –."  (Id. (Gardias Depo. at 117:10-17)).[8]

The successful candidate, William Shum, is an Asian-American with a bachelor's degree and a master's degree in architecture.  He completed 24 units of an MBA program and worked for several years in the private sector as a project designer and project manager.  His work experience included a $14 million project for the Convocational & Recreational Complex at Duquesne University in Pennsylvania, as well as the implementation of a $20 million program for the state of West Virginia, which included the construction of two new high schools and the renovation of nine middle and elementary schools.  Just prior to his employment at SJSU, Shum worked for seventeen years at California State University's San Bernardino campus as the Director of Planning, Design and Construction – a job whose duties reportedly were very similar to the PDC Director position at SJSU.  (Plaintiff's Index II).

**D.       Chief Engineer**

Gardias next applied for the position of Chief Engineer in January 2004.  The Chief Engineer is responsible for operating, maintaining and managing the University's energy infrastructure and 24-hour operations, including campus heating, ventilation and air conditioning systems.  As part of the essential duties of the job, the Chief Engineer has "24/7 operational responsibility" and is expected to (a) make recommendations for utility

---

[8]       In his subsequent "corrections" to his deposition testimony, plaintiff changed this answer to: "Yes, I do know what California Environmental Quality Act."  (Docket No. 247 at 10).  For reasons stated above, this court finds that this "correction" does not create a genuine issue of material fact.  (See Footnote 7, supra).

United States District Court

For the Northern District of California

1   improvements and expansion; (b) establish contingency plans in the event of a catastrophic

2   failure; (c) develop procedures for obtaining environmental licenses, permits and tests required

3   under state and federal law; (d) oversee the budget for utility operations; (e) work directly with

4   state and federal agencies and university departments concerned with water quality, wastewater

5   treatment, electrical power, and other utility matters; and (f) correspond with appropriate

6   regulatory and utility bodies.  (Rivera Decl., Ex. A at AGO0298-99).  Additionally, the Chief

7   Engineer must interpret technical procedures and regulations; write reports, business

8   correspondence and business manuals; and effectively present information and respond to

9   questions from groups of managers, customers, and the general public.  The Chief Engineer is

10  also expected to know local permitting requirements and applicable EPA regulations.  The job

11  description required ten years minimum experience in utilities operations and management,

12  with at least five years of progressive experience operating a cogeneration plant, boilers, and

13  chillers.  Budget and management experience was essential.  A four-year college degree in

14  electrical or mechanical engineering was preferred, but not required.  (Id.).

15      Gardias was not interviewed for this position.  Here, defendant points out that, in

16  deposition, plaintiff testified that when he got the job description, he had to look up the

17  acronym "EPA" and then wrote down its meaning – "Environmental Protection Agency" – on

18  his copy of the document.  (See Cain-Simon Decl., Ex. E (Gardias Depo. at 161:18-162:2));

19  Rivera Decl., Ex. A at AGO 0299).[9]

20      The job went to Scott Anderson.  Anderson began working at SJSU in 1979 as a

21  Building Service Engineer and over the next twenty-four years worked his way up to the

22  position of Supervising Building Service Engineer, overseeing and coordinating skilled and

23  semi-skilled crews as to the installation, maintenance and repair of campus utility systems.

24  (Plaintiff's Index III).   Prior to that, Anderson had finished one year of college and served four

25

26      [9]    In his subsequent corrections to his testimony, Gardias changed his answer to:

27  "When I notice term 'EPA' on job description I was not sure that this acronym was the same
    which I used in PDC.  I had to review the rules to be sure. . . No, I knew what the acronym
    'EPA' means.  But there are many acronyms and I always check."  (Docket No. 247 at 16).

28  For reasons stated above, this court finds that this "correction" does not create a genuine
    issue of material fact.  (See Footnote 7, supra).

United States District Court

For the Northern District of California

1   in the Navy, where he completed 6 months of technical training at the Navy's Boiler Technician

2   "A" School and Console Operations School and worked as a boiler technician (coordinating

3   boiler plant maintenance and monitoring console operations).  He then worked for several

4   months at the University of San Diego in the Physical Plant and Maintenance Operations

5   (performing general maintenance and repair on heating, ventilation, air conditioning and

6   electrical systems) just prior to his employment at SJSU.

7   **E.      Director of Energy & Utility Systems**

8       In May 2004, Gardias applied for the Director of Energy & Utility Systems position.

9   The Director of Energy & Utility Systems directs the operation of the University's energy and

10  utility services for all campus buildings.  The Director is expected to be available to respond to

11  operational and emergency calls 24 hours/day and is also responsible for (a) overseeing the

12  budget for all energy and utility operations (in the $6 million dollar range); (b) developing plans

13  and specifications for utilities systems (including upgrades and expansion); (c) preparing capital

14  improvement projects and budgets; (d) seeking funding for energy conservation projects and

15  prepare proposals for submission to grant agencies; (e) representing SJSU at related energy and

16  utility agency meetings and negotiations; (f) serving as the University's liaison with electric,

17  gas and water utility companies, including regulatory agencies; (g) reviewing and keeping

18  current with federal, state and city laws to ensure that the University is in compliance; and (h)

19  preparing financial status reports.  (Rivera Decl., Ex. A at AGO-0603-605; Plaintiff's Index I).

20  Additionally, the University's job description stated that the successful applicant must be able

21  to interpret technical procedures and regulations; write reports, business correspondence and

22  procedure manuals; and effectively present information and respond to questions from groups of

23  managers, customers, and the general public.  (Id.).

24      Gardias was not interviewed, and the position went to Adam Bayer.  Bayer has a

25  bachelor's degree in marine engineering, as well as a master's degree in engineering (with an

26  emphasis on engineering management).  He is a licensed California Professional Engineer

27  (mechanical and electrical engineering).  Bayer previously worked at Watters Marine Co. for

28  nine months as a ship superintendent (providing engineering supervision and management).  He

United States District Court

For the Northern District of California

1    then worked for nine years as a Chief Stationary Engineer at the University of California, Santa

2    Cruz (UCSC), where he supervised 12 employees and had responsibility for, among other

3    things, cogeneration facilities, the fire/security system, and 24/7 operations and maintenance.

4    He then stayed on for another six years at UCSC as a Senior Engineer in physical planning and

5    construction (working on capital/infrastructure programs and projects) just prior to his

6    employment at SJSU.  (Rivera Decl., Ex. A at AGO0622-0627).

7    **F.    Associate Director of Energy & Utilities/Campus Engineer**

8            Finally, in September 2005, plaintiff applied for the position of Associate Director of

9    Energy & Utilities.  After the position was posted, but before interviews were conducted, the

10   University withdrew the job announcement and re-issued it as "Campus Engineer."  Defendant

11   says that the job announcement was modified because University management wanted to

12   provide for a higher level of engineering skill and to add that a licensed Professional Engineer

13   was "highly desirable."  (Rivera Decl., Ex. A at AGO 1723).

14           The Campus Engineer works under the general direction of the Director of Energy &

15   Utilities and is responsible for managing personnel in the operation and maintenance of the

16   University's energy and utility systems.  Essential duties of the job include (a) conducting daily

17   job site supervision of staff; (b) monitoring and approving the activities of technical personnel

18   and services; (c) interviewing, hiring, training and supervising employees; and (d) assisting the

19   Director of Energy & Utilities in implementing the technical trades apprenticeship program.

20   (Rivera Decl., Ex. A at AGO 0810-0812).  According to the University's job posting, the

21   Campus Engineer must be able to interpret technical procedures and regulations; write reports,

22   business correspondence, and procedure manuals; and effectively present information and

23   respond to questions from groups of managers and technical trade staff, customers, and the

24   general public.  (Id.).

25           Gardias was among the applicants interviewed for the position.  Each of the interviewers

26   noted that he either did not know or did not use certain terminology, such as "VAV" (for

27   "variable air volume").  (Rivera Decl., Ex. A at AGO 0863-886).  In deposition, plaintiff

28   testified that he knows what "VAV" is, but does not use that acronym in his work.  (Cain Simon

**United States District Court**
For the Northern District of California

1   Decl., Ex. E (Gardias Depo. at 298:23-299:25)).[10]  Gardias also acknowledges that he does not

2   have a California professional engineering license, but asserts that he does not need one and that

3   he had a Polish license when he worked in Poland decades ago.  (Cain-Simon Decl., Ex. E

4   (Gardias Depo. at 319:20-320:8)).

5          The position was given to Simon Lee, an Asian-American male who has a bachelor's

6   degree and a master's degree in electrical engineering.  Lee is a licensed California Professional

7   Engineer, with special accreditation in energy and environmental design – accreditation that

8   Gardias admitted he himself lacked (see Cain-Simon Decl., Ex. E (Gardias Depo. at 320:19-

9   322:3)).  Just prior to his employment at SJSU, Lee worked on renovation, seismic retrofitting

10   and other construction projects for the University of California (at the Berkeley, Riverside, San

11   Francisco – Mission Bay, San Francisco – Parnassus, and Los Angeles campuses), as well as for

12   other entities, including the Crocker Art Museum, Chiron and Genentech.  (Rivera Decl.,

13   AGO895-897).

14   **G.     Central Plant Training and Energy Management Systems Training**

15          Gardias also claims that he was denied Central Plant training and Energy Management

16   Systems training because of his age and national origin and in retaliation for his previous

17   discrimination complaints against the University.

18          **1.     Central Plant Training**

19          There is no indication that the Central Plant training was needed for Gardias' job.  Nor

20   is it claimed that the absence of the training held him back from getting any of the jobs he had

21   sought.  Rather, Gardias wanted to have Central Plant training simply for his own edification.

22   (Plaintiff's Index VI; Cain-Simon Decl., Ex. E (Gardias Depo. at 182:22-183:9, 186:6-11)).

23   Scott Anderson and Dan Cox (two supervisors from Gardias' department) and Mike Nausin (an

24   employee who had worked for IPT, the contractor that previously operated the plant) were

25   slated to receive Central Plant training.  (See Cain-Simon Decl., Ex. E (Gardias Depo. at

26

27          [10]     In subsequent "corrections" to his testimony, Gardias changed his answer to
     indicate that he sometimes uses the term "VAV" in his work.  (Docket No. 247 at 28).  For
28   reasons stated above, this court finds that this "correction" does not create a genuine issue of
     material fact.  (See Footnote 7, supra).

United States District Court

For the Northern District of California

1   180:14-181:16)).  Although Gardias was not a supervisor and had no desire to work in the

2   Central Plant, he nonetheless felt that he should also have been given the same training in view

3   of "my many years experience in cogeneration plants and power plants."  (Plaintiff's Index VI).

4       In February 2004, Gardias reportedly was given "informal" permission to go to the plant

5   as a volunteer for two hours each day, along with the other trainees.  (Plaintiff's Index VI).

6   Gardias says that when he arrived at the plant, he was treated in a "rude manner" – i.e., no one

7   seemed particularly happy to see him; Anderson allegedly asked Gardias (in a brusque manner)

8   what he was doing there; and, when Gardias asked questions, manager Chris Nordby allegedly

9   responded, "No, I am busy, you will disturb my work."  (Id.).

10      In March 2004, Gardias asked Tony Valenzuela (Associate Vice President, FDO

11  department) for permission to go to the Central Plant over the weekend to review equipment

12  manuals.  Valenzuela said that such permission could not be given because of risk management

13  issues presented by having an "observer" in the plant and because plaintiff's union contract and

14  the Fair Labor Standards Act limited the University's ability to allow non-exempt employees to

15  be in and around a work station without pay.  (Plaintiff's Index VI).  Defendant maintains that

16  there was no legitimate business reason for Gardias to be trained at the Central Plant because he

17  was not a supervisor and did not want to be assigned to work there.  (Cain-Simon Decl., Ex. E

18  (Gardias Depo. at 182:22-183:9); Valenzuela Decl., ¶ 3; Rivera Decl., Ex. A at AGO-0443).[11]

19      **2.    Energy Management System Training**

20      In Gardias' June 2003 performance review, he was encouraged to learn more about the

21  functions of the Energy Management System ("EMS").  (Plaintiff's Index: "Valenzuela's

22   Perjury.").  Sometime later, Gardias learned that a co-worker in his department received EMS

23  training.  He apparently found this unfair because Gardias believes that his skills and experience

24

25      [11]    Gardias later "corrected" his deposition testimony to say that he did not recall
    whether he said he did not want to work at the Central Plant, but confirms that he had no
26  intent, in any event, of working again as an Operating Engineer there.  (Docket No. 247 at
    18).  He also corrected his deposition testimony to say that he did not wish to speculate as to
27  the reasons he wanted training:  "I ask you to direct this question to SJSU.  I do not see any
    reason to participate in speculations."  (Id. at 19).  For the reasons stated above, the court
28  finds that these corrections do not create a genuine issue of material fact.  (See Footnote 7,
    supra).

are superior to that of his co-worker, who reportedly never completed his apprenticeship.

Nevertheless, Gardias later testified in deposition that he did not feel he needed EMS training

and decided that he would train himself.  (Cain-Simon Decl., Ex. E (Gardias Depo. at 173:20-

174:22)).  So, instead of asking to be trained, Gardias simply demanded that Scott Anderson

give him the password for the entire system.  (Id.).  Anderson said no.  Gardias felt that this,

too, was unfair because he believes that his own education and experience are superior to

Anderson's.  But, according to Anderson, there was no legitimate reason for plaintiff to have

that password – the requested password controls the HVAC, fans and steam for the University's

buildings; and, its uncontrolled use, in untrained hands, "could potentially have wreaked

havoc."  (Anderson Decl., ¶ 3).

**H.**     **Alleged Harassment and Retaliation**

In addition to the failure to promote and alleged denial of training, Gardias claims that

he has been subjected to various acts of harassment and retaliation (discussed in more detail

below).

These events led plaintiff to file five separate lawsuits in this court, all of which have

been consolidated into a single action.[12]  Defendant moves for summary judgment on the

ground that plaintiff has failed to present evidence that any of the hiring decisions or other

alleged conduct was based upon any unlawful motive.

## II.  LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P.

56(c)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party bears

the initial burden of informing the court of the basis for the motion, and identifying portions of

the pleadings, depositions, answers to interrogatories, admissions, or affidavits which

demonstrate the absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986).  In order to meet its burden, "the moving party must either produce evidence

---

[12]     After his first five lawsuits were consolidated, plaintiff filed two more
employment discrimination lawsuits against defendant in this court.  Those cases (Case Nos.
C07-06242 and C08-05498) have not been consolidated with the instant action.

United States District Court

For the Northern District of California

1   negating an essential element of the nonmoving party's claim or defense or show that the

2   nonmoving party does not have enough evidence of an essential element to carry its ultimate

3   burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.,

4   210 F.3d 1099, 1102 (9th Cir. 2000).

5       If the moving party meets its initial burden, the burden shifts to the non-moving party to

6   produce evidence supporting its claims or defenses. See FED. R. CIV. P. 56(e)(2); Nissan Fire &

7   Marine Ins. Co., Ltd., 210 F.3d at 1102. The non-moving party may not rest upon mere

8   allegations or denials of the adverse party's evidence, but instead must produce admissible

9   evidence that shows there is a genuine issue of material fact for trial. See id. A genuine issue

10  of fact is one that could reasonably be resolved in favor of either party. A dispute is "material"

11  only if it could affect the outcome of the suit under the governing law. Anderson, 477 U.S. at

12  248-49.

13      "When the nonmoving party has the burden of proof at trial, the moving party need only

14  point out 'that there is an absence of evidence to support the nonmoving party's case.'"

15  Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at

16  325). Once the moving party meets this burden, the nonmoving party may not rest upon mere

17  allegations or denials, but must present evidence sufficient to demonstrate that there is a

18  genuine issue for trial. Id.

### III.  DISCUSSION

19

20  **A.    Evidentiary Objections**

21      Before turning to a substantive discussion of the issues, the court will first address the

22  parties' respective evidentiary objections.

23      Plaintiff broadly objects to various statements made in declarations submitted by

24  defendant and claims that defense counsel and other declarants have "committed fraud" and

25  "perjury." However, this court finds no basis to conclude that anyone has lied or engaged in

26  any fraud. Instead, it appears that plaintiff is merely expressing disagreement as to defendant's

27  assertions and characterization of the events in question. Additionally, Gardias objects to the

28  Declaration of Maria Rivera on the ground that Rivera testifies only that the documents

**United States District Court**
For the Northern District of California

1    appended to her declaration are true and correct copies of the documents in SJSU's files, but

2    does not testify about their contents.  Rivera's declaration apparently was submitted solely to

3    authenticate the University's records.  It is perfectly permissible.  Plaintiff's evidentiary

4    objections are overruled.

5         In support of his opposition to the instant motion, Gardias submitted some 600 pages of

6    documents and exhibits, which he compiled into about eight separate indices.  Defendant

7    objects to these documents on one or more of the grounds that they are not authenticated, are

8    hearsay, or are merely self-serving documents Gardias wrote himself, purporting to detail the

9    events forming the bases for his various grievances.  Indeed, much of plaintiff's "evidence"

10   suffers from these defects.  Nevertheless, with the exception of documents pertaining to

11   plaintiff's withdrawn health-related claims, this court has reviewed and considered all of

12   plaintiff's papers.

13   **B.**     **Plaintiff's Age Discrimination Claims**

14        Defendant contends that it is entitled to summary judgment as to plaintiff's age

15   discrimination claims because those claims are barred by the Eleventh Amendment.

16        The Eleventh Amendment provides:  "The Judicial power of the United States shall not

17   be construed to extend to any suit in law or equity, commenced or prosecuted against one of the

18   United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

19   U.S. CONST. amend. XI.  It "has been interpreted to shield States from suits by individuals

20   absent the State's consent."  Wells v. Bd. of Trustees of the California State Univ., 393

21   F.Supp.2d 990, 995 (N.D. Cal. 2005) (citing Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54,

22   116 S. Ct. 1114, 134 L.Ed.2d 252 (1996)).  "The same immunity also applies to state agencies."

23   Hibbs v. Dep't of Human Resources, 273 F.3d 844, 850 (9th Cir. 2001) (citing Fla. Dep't of

24   State v. Treasure Salvors, Inc., 458 U.S. 670, 684, 102 S. Ct. 3304, 73 L.Ed.2d 1057 (1982)).

25        The Age Discrimination in Employment Act ("ADEA") "is the exclusive remedy for

26   claims of age discrimination in employment, even those claims with their source in the

27   Constitution."  Ahlmeyer v. Nevada Sys. of Higher Education, 555 F.3d 1051, 1060-61 (9th

28   Cir., 2009).  The United States Supreme Court has held that the ADEA did not abrogate the

**United States District Court**
For the Northern District of California

1    states' Eleventh Amendment immunity from suit by private individuals.  Kimel v. Florida Bd.

2    of Regents, 528 U.S. 62, 92, 120 S. Ct. 631, 145 L.Ed.2d 522 (2000).  "Nothing in Kimel

3    suggests that the Court intended to remove the statutory jurisdictional basis for age

4    discrimination suits against a state or its agencies."  Katz v. Regents of the Univ. of California,

5    229 F.3d 831, 834 (9th Cir. 2000).  Nonetheless, "on account of Eleventh Amendment

6    immunity the states can not be compelled to submit to the jurisdiction of the federal courts in

7    such suits."  Id.[13]

8            Defendant is an arm of the state entitled to claim Eleventh Amendment immunity.  See

9    Stanley v. Trustees of the California State University, 433 F.3d 1129, 1133 (9th Cir. 2006)

10   ("We have previously held that the Trustees [of the California State University] are an arm of

11   the state that can properly lay claim to sovereign immunity.") (citing Jackson v. Hayakawa, 682

12   F.2d 1344, 1350-51 (9th Cir. 1982)); see also Wells, 393 F. Supp.2d at 995 (same).  On the

13   record presented, there is no indication that defendant has expressly waived that immunity.  See

14   Aholelei v. Dep't of Public Safety, 488 F.3d 1144, 1148-49 (9th Cir. 2007) (holding that, even

15   where the state defendants filed a third-party complaint, they did not waive their Eleventh

16   Amendment immunity defense as to plaintiff's claims where the defense was promptly asserted

17   in their answer, was never expressly waived, and subsequently was litigated on summary

18   judgment).

19           Accordingly, defendant's motion for summary judgment as to plaintiff's claims of age

20   discrimination is granted.

21

22

23

24

25

26

27          [13]     "A state employee alleging age discrimination in employment is not without a
     forum altogether, because he can file an ADEA suit in state court."  Ahlmeyer, 555 F.3d at
28   1060 n.9.  Defendant advises that plaintiff filed, and subsequently dismissed, several state
     court lawsuits against the University for alleged discrimination.

16

**United States District Court**
For the Northern District of California

1    **C.      Title VII Claims**

2          **1.      Time-Barred Claims**

3          Defendant contends that plaintiff's national origin claim alleged in his first lawsuit

4    (Case No. C04-04086), as well as all claims alleged in his third lawsuit, (Case No. C05-01833)

5    are time-barred.

6          "Before a claimant can file a Title VII civil action, [he] must file a timely charge of

7    discrimination with the EEOC."  Nelmida v. Shelley Eurocars, Inc., 112 F.3d 380, 383 (9th Cir.

8    1997).  "If the EEOC dismisses the charge, a claimant has ninety days to file a civil action."  Id.

9    "This ninety-day period is a statute of limitations."  Id. (citing Scholar v. Pacific Bell, 963 F.2d

10   264, 266-67 (9th Cir. 1992)).  "Therefore, if a claimant fails to file the civil action within the

11   ninety-day period, the action is barred."  Id.

12         Equitable doctrines are available to save otherwise untimely claims.  Equitable estoppel

13   "'focuses primarily on the actions taken by the defendant in preventing a plaintiff from filing

14   suit.'"  Johnson v. Henderson, 314 F.3d 409, 414 (9th Cir. 2002) (quoting Santa Maria v. Pac.

15   Bell, 202 F.3d 1170, 1176 (9th Cir. 2000).

16         The doctrine of equitable tolling, on the other hand, "focuses on whether there was

17   excusable delay by the plaintiff."  Johnson, 314 F.3d at 414.  Equitable tolling may be applied

18   where there is excusable ignorance of the limitations period and a lack of prejudice to defendant

19   or where there is no danger of prejudice to defendant and the interests of justice require relief.

20   Forester v. Chertoff, 500 F.3d 920, 930 (9th Cir. 2007).  "This doctrine has been consistently

21   applied to excuse a claimant's failure to comply with the time limitations where [he] had neither

22   actual nor constructive notice of the filing period."  Leorna v. U.S. Dep't of State, 105 F.3d 548,

23   551 (9th Cir. 1997)).  "Equitable tolling is, however, to be applied only sparingly."  Nelmida,

24   112 F.3d at 384 (citing Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96, 111 S. Ct. 453, 112

25   L.Ed.2d 435 (1990)).  "Courts have been generally unforgiving . . . when a late filing is due to

26   claimant's failure 'to exercise due diligence in preserving his legal rights.'"  Scholar, 963 F.2d

27   at 268 (quoting Irwin, 498 U.S. at 96).

28

United States District Court

For the Northern District of California

1    Plaintiff's form complaint in Case No. C04-04086 was filed on September 27, 2004.

2    (See Case No. C04-04086, Complaint, Docket No. 1).  It alleged that defendant failed to

3    promote him to the PDC Director position because of his age and in retaliation for his prior

4    discrimination complaints.  He did not check the line for national origin discrimination.  The

5    allegations apparently were the subject of Gardias' EEOC Charge No. 377-2004-00260.

6    Gardias says that he received the EEOC's Notice of Right to Sue on or about July 2, 2004.

7    Thus, his original complaint timely was filed.  However, several months later, on November 10,

8    2004, he filed an amended complaint, in which he checked the line for national origin

9    discrimination.  (Case No. C04-04086, Docket No. 7).  It is not clear whether Gardias alleged

10   national origin discrimination in the underlying EEOC charge.  Assuming he did, plaintiff offers

11   no explanation for his failure to timely allege it in his federal complaint, and this court finds no

12   basis for tolling.

13   In Case No. C05-01833, plaintiff's form complaint alleged (a) discrimination and

14   retaliation based on his reassignment from Building Official Assistant to his prior Building

15   Service Engineer position and the denial of his application for the Construction Coordinator

16   position and (b) harassment.  (See Case No. C05-01833HRL, Complaint, Docket No. 1).  The

17   claims were the subject of Gardias' EEOC Charge No. 377A300337 filed on March 27, 2003.

18   Gardias says that he received the EEOC's Notice of Right to Sue on or about June 30, 2003.

19   His federal complaint, however, was not filed until nearly two years later on May 4, 2005.  (See

20   Case No. C05-01833HRL, Complaint, Docket No. 1).  The claims are therefore untimely.

21   This court finds no basis for any tolling here either.  Gardias acknowledges that his

22   complaint was belatedly filed, but says that he should be excused because he discovered in

23   December 2004 that defendant "falsified" the requirements for the Construction Coordinator

24   position.  (See Case No. C05-01833, Complaint, Docket No. 1 at 3).  In deposition, plaintiff

25   testified that he meant that defendant had provided to the EEOC only the front page, but not the

26   back page, of the job description.  (Cain-Simon Decl., Ex. E (Gardias Depo. at 213:2-214:1)).

27   This is not a ground for tolling – equitable or otherwise.  There is no apparent dispute that

28   plaintiff was given proper and adequate notice at all stages of the grievance process.  Moreover,

1    it is not argued that plaintiff was misled or misinformed by defendant with respect to the

2    requirements of the Construction Coordinator position or any applicable deadlines; and, there is

3    no evidence in the record to suggest that the omission of the back page of the job description in

4    defendant's submission to the EEOC in any way prevented Gardias from timely filing suit.

5          Gardias argues that the subject claims should not be barred because they are related to

6    his original complaint filed in C04-04086HRL and to another EEOC charge (Charge No. 377-

7    2004-00612), which resulted in his second federal lawsuit, Case No. C04-04768HRL.  (See

8    Case No. C05-01833, Complaint, Docket No. 1 at 2).  Although both of those lawsuits were

9    filed earlier in time, they were still filed well beyond the 90-day limitations period from the

10   EEOC charge that forms the basis for the belated complaint filed in C05-01833.  In any event,

11   each of Gardias' complaints (and the underlying EEOC charges) concern different positions that

12   he says he was unfairly denied.  Discrete acts, such as the failure to promote and denial of

13   training, "'are not actionable if time barred, even when they are related to acts alleged in timely

14   filed charges.'"  Lyons v. England, 307 F.3d 1092, 1105 (9th Cir. 2002) (quoting Nat'l R.R.

15   Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L.Ed.2d 106 (2002)).  Nor

16   are plaintiff's claims saved by the fact that he repeated them in his fifth complaint filed in Case

17   No. C06-04695.  See Scholar, 963 F.2d at 268 ("'[t]here is no reason why a plaintiff should

18   enjoy a manipulable open-ended time extension which could render the statutory limitation

19   meaningless.'") (quoting Lewis v. Conners Steel Co., 673 F.2d 1240, 1242 (11th Cir. 1982)).

20   Accordingly, plaintiff's claims pertaining to the Building Official Assistant position and the

21   failure to promote him to the Construction Coordinator position are time-barred.

22         Even assuming that all of these claims were timely filed, for the reasons discussed more

23   fully below, this court concludes that defendant is entitled to summary judgment as to plaintiff's

24   claims of discrimination.  Plaintiff also broadly claims harassment in his time-barred C05-

25   01833 complaint; and, "'a hostile work environment claim . . . will not be barred so long as all

26   acts which constitute the claim are part of the same unlawful employment practice and at least

27   one act falls within the time period.'"  Lyons, 307 F.3d at 1105-06 (quoting Nat'l R.R.

28   Passenger Corp. v. Morgan, 536 U.S. at 113).  As discussed more fully below, however, the

**United States District Court**
For the Northern District of California

19

court finds that plaintiff's harassment allegations, even if considered as part of the larger panoply of harassment alleged in all of his lawsuits, are insufficient to create a hostile work environment.

### 2.   Burdens of Proof

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex and national origin.  42 U.S.C. § 2000e-2(a)(1).

"[W]hen responding to a summary judgment motion, the plaintiff is presented with a choice regarding how to establish his or her case."  McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1122 (9th Cir. 2004)).  A plaintiff may proceed by following the McDonnell Douglas[14] framework, or alternatively, may produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant.  Id.

Under the McDonnell Douglas burden-shifting framework, a plaintiff must establish a *prima facie* case of discrimination.  See Vasquez v. County of Los Angeles, 349 F.3d 634, 640 (9th Cir.2003).  If the plaintiff successfully establishes a *prima facie* case, then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct.  Id.  If the employer does so, then the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination.  Id.

Plaintiff bears the ultimate burden of proving discrimination.  Thus, whether he relies on the McDonnell Douglas framework, or whether he relies on direct or circumstantial evidence, a plaintiff must produce some evidence suggesting that defendant's failure to promote him was due in whole or in part to discriminatory intent.  McGinest, 360 F.3d at 1123.

For the reasons explained below, this court finds that, under either approach, plaintiff has not established that defendant's decisions as to his employment were based upon any discriminatory motive.

---

[14]     McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

United States District Court
For the Northern District of California

### 3.      Failure to Promote

In order to establish a *prima facie* case of discrimination, a plaintiff must show that (1) he belongs to a protected class; (2) he applied for and was qualified for the position he was denied; (3) he was rejected despite his qualifications; and (4) the employer filled the position with an employee not of plaintiff's class, or continued to consider other applicants whose qualifications were comparable to plaintiff's after rejecting plaintiff.  See Dominguez-Curry v. Nevada Transp. Dep't, 424 F.3d 1027, 1037 (9th Cir. 2005) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  "If established, the prima facie case creates a rebuttable presumption that the employer unlawfully discriminated against the plaintiff.  The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action."  Id.  "If the employer meets this burden, the presumption of unlawful discrimination 'simply drops out of the picture.'"  Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L.Ed.2d 407 (1993)).

"The plaintiff then must produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination."  Dominguez-Curry, 424 F.3d at 1037 (citing Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000)).  "The plaintiff may show pretext either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable."  Id. at 1037 (citing Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220-22 (9th Cir. 1998)).

In the instant case, Gardias essentially claims that he is more qualified than the applicants chosen for the positions at issue (or is, at least, equally qualified to them), but that he was denied all of the positions he applied for because he is Polish.  He has submitted papers concerning his education and work experience, as well as affidavits from some of his work colleagues who opine that plaintiff was qualified for the positions he sought.  (Plaintiff's Index I; Plaintiff's "Valenzuela's Perjury" Index: Burdick Decl., Bersuch Decl., Jansen Decl., Morris Decl.).  As noted above, however, the vast majority of plaintiff's "evidence" consists of his own

United States District Court
For the Northern District of California

1  letters, memos, and other narratives, replete with hearsay, purporting to describe the events

2  forming the basis for his complaints.  Even assuming that plaintiff could establish a *prima facie*

3  case of discrimination, defendant offers a legitimate, nondiscriminatory reason for its decisions:

4  the chosen applicants were more qualified and had more relevant and recent experience than

5  plaintiff.

6  Nonetheless, "[e]ven if it were uncontested that [the successful applicants']

7  qualifications were superior, this would not preclude a finding of discrimination." Dominguez-

8  Curry, 424 F.3d at 1040.  "An employer may be held liable under Title VII even if it had a

9  legitimate reason for its employment decision, as long as an illegitimate reason was a

10  motivating factor in the decision." Id.  In other words, [t]he central focus of the inquiry in a

11  case such as this is always whether the employer is treating 'some people less favorably than

12  others because of their race, color, religion, sex, or national origin.'" Furnco Constr. Corp. v.

13  Waters, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L.Ed.2d 957 (1978) (quoting Teamsters v. United

14  States, 431 U.S. 324, 335 n.15, 97 S. Ct. 1843, 1854, L.Ed.2d 396 (1977)).

15  Here, Gardias' claims fail because he cannot establish that defendant's articulated non-

16  discriminatory reasons for the failure to promote him are pretextual.  Nor does this court find

17  any evidence even suggesting discriminatory animus on the basis of plaintiff's national origin.

18  Indeed, although it is not the court's task to scour the record in search of a genuine issue of

19  triable fact, see Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996), this court has reviewed

20  every one of plaintiff's myriad filings in these five consolidated lawsuits (comprising some

21  several thousand pages), including his extensive "corrections" to his deposition testimony.

22  Nothing in the record before this court raises a genuine issue of material fact as to any national

23  origin discrimination with respect to the jobs he claims should have been his.

24  The only "evidence" plaintiff relies upon in support of his discrimination claim is his

25  supposition that various persons at the University must have discriminated against him because

26  they do not happen to be Polish.  For example, Gardias says that he learned that Brad Davis

27  (who apparently was the University's EEO compliance officer) is a Jew.  (Plaintiff's Index

28  VII.1).  On this basis alone, plaintiff surmises that Davis must have acted with discriminatory

United States District Court

For the Northern District of California

1    intent.  Here, Gardias points out that in 2002, he wrote (a) a letter to Congresswoman Zoe

2    Lofgren, complaining about U.S. support for Israel and (b) a letter to SJSU's president (which

3    was published in the University's Spartan Daily newspaper), complaining that the newspaper

4    printed numerous articles about the suffering of Jews, but none about the suffering of Polish

5    people.  (Id.).  Without proof that Davis was aware of these missives, Gardias claims that Davis

6    "falsified" evidence (i.e., failed to send the back page of the Construction Coordinator job

7    description to the EEOC) and that Davis was motivated to do so because he is a Jew.  (Id.).

8    Similarly, Gardias argues that Tony Valenzuela is Mexican and that all actions taken by

9    Valenzuela therefore are discriminatory.  In deposition, Gardias testified that, on one occasion,

10   Valenzuela allegedly shook hands with someone named Herman Gonzales (another individual

11   whom Gardias says is of Mexican descent), but did not greet plaintiff or shake his hand.  (Cain-

12   Simon Decl., Ex. E (Gardias Depo. at 172:2-10)).  Gardias has similarly attributed

13   discriminatory intent to various other individuals because they are (or he believes them to be) of

14   some heritage other than Polish.  (See, e.g., Plaintiff's Opp. at 9, Subsection C).

15        In an effort to prove this race-based theory, plaintiff testified in deposition that there are

16   fewer white people working in his department now than there were before Valenzuela came to

17   work for the University.  (See Cain-Simon Decl., Ex. E (Gardias Depo. at 589:12-591:10)).

18   However, Gardias acknowledged that he did not know why certain white employees left SJSU,

19   and stated, "It's difficult to say discrimination, because you have to prove."  (Id. at 591:9-10).

20   There is no statistical evidence to corroborate that there are, in fact, fewer whites in his

21   department now, or to even suggest that defendant has a pattern or practice of employing non-

22   whites over equally qualified whites.  In any event, Gardias' speculative assertion is not

23   probative of his claim that he was treated differently because of his Polish national origin.

24   Nowhere in plaintiff's twenty years employment at SJSU is there even a suggestion of an anti-

25   Polish slur or that anyone ever referred to his Polish origin in a disparaging manner.  None.

26   Ever.  Nor do his speculative, race-based generalizations give rise to a genuine issue of material

27   fact as to the existence of any disparate treatment or intent to discriminate on the basis of his

28

1    national origin.  Accordingly, defendant's motion for summary judgment as to plaintiff's

2    failure-to-promote claims is granted.

3        **4.    Harassment**

4        Likewise, this court finds no triable issue as to whether Gardias was subject to a hostile

5    work environment.

6        Title VII's prohibition against unlawful employment practices "encompasses the

7    creation of a hostile work environment, which violates Title VII's guarantee of 'the right to

8    work in an environment free from discriminatory intimidation, ridicule, and insult.'"  McGinest,

9    360 F.3d at 1112 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399,

10   91 L.Ed.2d 49 (1986)).  To prevail on a hostile work environment claim, Gardias must show

11   that his work environment was both subjectively and objectively hostile – that is, he must show

12   that he perceived his work environment to be hostile, and that a reasonable person in his

13   position would perceive it to be so.  Dominguez-Curry, 424 F.3d at 1034.  In determining

14   whether the alleged conduct created an objectively hostile work environment, the court

15   evaluates "all the circumstances, 'including the frequency of the discriminatory conduct; its

16   severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

17   whether it unreasonably interferes with an employee's work performance.'"  Id. at 1034

18   (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71, 121 S. Ct. 1508, 149 L.Ed.2d

19   509 (2001)).  "'Simple teasing,' offhand comments, and isolated incidents (unless extremely

20   serious) will not amount to discriminatory changes in the 'terms and conditions of

21   employment.'"  Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275,

22   141 L.Ed.2d 662 (1998)).

23       Liberally construed, the record reveals that the instances of alleged harassment are as

24   follows:

25       •    The June 2002 incident (discussed in Section I.A., supra) when Art Heinrich
            allegedly yelled at plaintiff to "get out of my office."  (Plaintiff's Index VI).

26

27       •    The "rude manner" in which plaintiff allegedly was treated when he showed up
            at the Central Plant for training in 2004 (discussed in Section I.G., supra);

28

24

United States District Court

For the Northern District of California

1
2
- • In 2004, another employee reportedly told Gardias that, at some point in time, swastikas had been painted in the basement of the Central Plant during plaintiff's work shift at the University. (Plaintiff's Index VII.1).[12]

3
4
5
- • During a May 2007 meeting, Gardias says that he asked Adam Bayer for an organizational chart for the University. Bayer allegedly said "with angry voice: 'Peter, you are a grown man, you should be able to find this information on the internet on your own.'" (Docket No. 223 at 4).

6
7
8
- • In April 2008, Gardias was speaking with his supervisor, Darin Adams, in Adams' office. According to plaintiff, Chris Nordby created a "hostile work environment" when he "came [into the office], without any greeting, and interrupted our conversation (not for the first time)." (Plaintiff's Index: "Valenzuela's Perjury").

9
- • At some point in time, Bayer allegedly called plaintiff's colleagues "stupid." (Id.).

10
- • At some point in time, someone somewhere made "sexual slurs." (Id.)

11       Title VII "does not set forth 'a general civility code for the American workplace.'"

12   Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L.Ed.2d 345

13   (2006) (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S. Ct. 998,

14   140 L.Ed.2d 201 (1998)); Manatt v. Bank of America, NA, 339 F.3d 792, 798 (9th Cir. 2003)

15   (quoting Faragher, 524 U.S. at 788). Even viewing the record in the light most favorable to

16   plaintiff, there is no triable fact issue here. These fleeting and random events are, for the most

17   part, nonactionable petty slights – and are, in any event, not severe or pervasive enough to

18   violate Title VII. See, e.g., Vasquez, 349 F.3d at 642-44 (concluding that defendant's few

19   comments about Hispanics and other alleged harassment, made over the course of more than

20   one year, did not create a hostile work environment). Defendant's motion for summary

21   judgment as to plaintiff's harassment/hostile work environment claims is granted.

22
23
24
25
26
27
28

---

[12]     There is no claim that plaintiff saw the swastikas or any suggestion they were meant for him. Indeed, the court is at a loss to speculate why plaintiff cites this as "evidence" of harassment of him.

### 5.      Retaliation Claims

Gardias broadly asserts that all of defendant's alleged conduct, decisions and actions constitute retaliation for the filing of his various complaints.[13]  Additionally, he claims that defendant engaged in other retaliatory acts as follows:

- During a June 13, 2007 meeting, Adam Bayer allegedly "falsely accused" plaintiff of putting filters for multiple buildings on a single work order and "degraded [his] communication skills."  (Docket No. 223).

- On April 19, 2006, Scott Anderson sent plaintiff a memo, alleging that Gardias left his work area without permission.  During a subsequent meeting with Anderson, Gardias reportedly verified that he was away from his work area during a regularly scheduled break.  (Plaintiff's Index VII.1).

- On April 24, 2006, Anderson issued another memo to plaintiff when Gardias refused to return his phone calls.  Gardias claims that he was afraid to speak with Anderson.  But he does not deny that he refused to answer Anderson's calls and that he had other employees return Anderson's phone calls for him.  (Plaintiff's Index VII.1).

Title VII prohibits an employer "'from retaliating against an applicant for employment because the applicant has opposed any unlawful employment practice, or has made a charge, testified, assisted, or participated in an employment discrimination investigation or proceeding.'"  Lyons, 307 F.3d at 1103 (9th Cir. 2002) (quoting Lam v. Univ. of Hawaii, 40 F.3d 1551, 1558-59 (9th Cir. 1994)); 42 U.S.C. § 2000e-3(a).  The same burden-shifting analysis that applies to claims for discrimination also apply to retaliation claims under Title VII.  To make a *prima facie* case of retaliation, a plaintiff "must establish that he undertook a protected activity under Title VII, his employer subjected him to an adverse employment action, and there is a causal link between those two events."  Vasquez, 349 F.3d at 646.

Under the circumstances presented, no reasonable trier of fact could conclude that the alleged false accusation by Bayer and Anderson's memos are "adverse actions."  "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  White, 548 U.S. at 67.  Thus, an "adverse action," for purposes of a Title VII retaliation claim, requires a showing that "a reasonable employee would have found

---

[13]      In deposition, plaintiff testified that he is not asserting any claim as to a September 24, 2004 Letter of Instruction issued by John Skyberg.  (See Cain-Simon Decl., Ex. E (Gardias Depo. at 342:14-346:24); Rivera Decl., Ex. A, AGO 558-59).

United States District Court

For the Northern District of California

the challenged action materially adverse" – i.e., that the action "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" White, 548 U.S. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). "Context matters," and whether a particular challenged action is materially adverse will depend upon the particular circumstances. Id. at 69. The "standard for judging harm must be objective. . . . It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." Id.

Here, Gardias admits to the conduct which formed the basis for the April 24, 2006 memo of concern. As for the alleged false accusations in Anderson's April 19, 2006 memo and by Bayer in 2007, the record shows that, at most, Gardias was upset. Although the memos state that future misconduct might result in corrective or disciplinary action, the facts do not indicate that Gardias was further disciplined. Nor does the record show that he was demoted, stripped of work, fired, suspended or reduced in salary or any other benefit as a result of the memos and the alleged false accusations. Moreover, while Gardias says that the April 19, 2006 memo caused him to have an anxiety attack, there is nothing in the record (other than his bare assertion) to suggest that the memo was issued with the "intent . . . to kill plaintiff." (Docket No. 279 at 2).

Even viewing the record as a whole, and assuming that plaintiff could establish a prima facie case, he has not presented evidence giving rise to a triable issue as to any pretext. In disposing of plaintiff's national origin discrimination claim, this court found that defendant's reasons for the failure to promote him were legitimate and non-discriminatory. In an apparent attempt to show that defendant's explanation is a mere pretext for retaliation, Gardias broadly suggests that the timing of defendant's hiring decisions and other alleged acts speak for themselves. That is, in plaintiff's view, every hiring decision and other alleged acts must have been retaliatory because they occurred at some point in time after he filed a charge with the EEOC or a complaint in court.

To begin – and putting aside, for the moment, the untimeliness of some of plaintiff's claims – nothing about the termination of the Building Official Assistant position and defendant's decision as to the Construction Coordinator position could have been retaliatory

United States District Court

For the Northern District of California

1    because those decisions were made before Gardias filed any of the EEOC charges or lawsuits at

2    issue here.[14]

3          In any event, in determining whether plaintiff's evidence passes summary judgment

4    muster, the length of time between a protected activity and an adverse employment action is not

5    to be considered "without regard to its factual setting." Coszalter v. City of Salem, 320 F.3d

6    968, 978 (9th Cir. 2003). Here, the factual setting indicates that, for the past six years or so,

7    plaintiff has become a serial complaint-filer – lodging a steady stream of administrative

8    charges, followed by federal and state court lawsuits, for every decision, act, or perceived slight

9    allegedly based on his national origin. As such, every decision or act complained of in the

10   instant consolidated action likely occurred in some temporal proximity to one of Gardias' string

11   of filings. But Gardias has presented nothing beyond the bare fact of the timing to rebut what

12   otherwise appear to be perfectly legitimate decisions by defendant. See, e.g., Brooks v. City of

13   San Mateo, 229 F.3d 917, 928 (9th Cir. 2000) (refusing to make a "complaint tantamount to a

14   'get out of jail free' card for employees engaged in job misconduct.").[15]

15         Accordingly, defendant's motion as to plaintiff's claims of unlawful retaliation is

16   granted.

17                        **IV.  CONCLUSION**

18         In essence, Gardias' claims boil down to the simple proposition that he was not hired for

19   certain positions ergo defendant must have discriminated against him. But Title VII does not

20   command that Gardias obtain positions simply because he believes himself to be qualified (or

21   believes that others are unqualified). Rather, Gardias must offer evidence that would support a

22   reasonable jury finding that defendant's conduct was based in whole or in part upon some

23   unlawful motive. Was there that evidence? There is no potential for liability without it.

24

25   [14]    The court's electronic docketing system indicates that Gardias previously
     filed a federal complaint against the University in 1996 and another in 1997. Both were
26   voluntarily dismissed in 1998. At any rate, there is no causal link between those lawsuits
     and defendant's decisions, made at least four to five years later, as to the Building Official
27   Assistant position and the Construction Coordinator job.

28   [15]    This court does not suggest that Gardias was engaging in "misconduct," but
     the sense of logic expressed by the Brooks court applies here as well.

United States District Court

For the Northern District of California

1   Despite its volume, plaintiff's proffered "evidence" is a veritable potpourri of random

2   assertions, events, and perceived slights – much of which relies on conjecture ladled with

3   speculation.  In short, Gardias has not linked defendant's decisions and other alleged conduct

4   with any unlawful motive.

5                                    **V.   ORDER**

6           Based on the foregoing, IT IS ORDERED THAT defendant's motion for summary

7   judgment is GRANTED.  The clerk shall enter judgment and close the file in all consolidated

8   actions.

9   Dated:     March 31, 2009

10

11  _____
    HOWARD R. LLOYD
    UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**5:04-cv-4086 Notice has been electronically mailed to:**

2

Fiel Dizon Tigno fiel.tigno@doj.ca.gov

3

Mary Susan Cain-Simon Mary.CainSimon@doj.ca.gov, Leticia.MartinezCarter@doj.ca.gov

4

**Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program**.

5

6

**5:04-cv-4086 Notice mailed to:**

7

Piotr J. Gardias
72 Floyd St.

8

San Jose, CA 95110

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California